**IN THE UNITED STATES DISTRICT COURT
NORTHER DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **USI INSURANCE SERVICES LLC,** | ) ) ) | |
| **Plaintiff,** | ) ) | **Civil Action File No.** |
| **v.** | ) ) | _____ |
| **CHRISTOPHER KANE and PALMER & CAY, LLC,** | ) ) ) | |
| **Defendants.** | ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff USI Insurance Services LLC ("USI") hereby brings the following Complaint for Injunctive Relief and Damages against Defendants Christopher Kane ("Kane") and Palmer & Cay, LLC ("P&C") (collectively, "Defendants") and respectfully states as follows:

### Nature of This Action

1.     USI brings this action against Defendants to enforce the Employment Agreement between USI and Kane, USI's former employee, which Kane has violated and continues to violate on behalf of and, upon information and belief, with the knowledge, encouragement, and assistance of P&C, USI's direct competitor and Kane's current employer. USI seeks injunctive relief against Defendants to stop

Kane's ongoing and threatened violations of his contractual obligations and P&C's tortious interference and seeks monetary damages to compensate for damages that Defendants' conduct has caused USI to incur to date. USI reserves the right to amend this Complaint to assert additional claims as they may be discovered.

## Parties

2.      USI is a Delaware limited liability company registered to do business in Georgia with its principal place of business in New York. USI's sole member is USI, Inc., a Delaware corporation with its principal place of business in New York. For purposes of determining diversity jurisdiction, USI is a citizen of Delaware and New York.

3.      Kane is an individual who is a resident of Georgia and resides and can be personally served at 3001 Vickery Trace Roswell, Georgia 30075. For purposes of determining diversity jurisdiction, Kane is a citizen of Georgia.

4.      P&C is a Georgia limited liability company with its principal place of business in Georgia. Upon information and belief, no member of P&C is a citizen of Delaware or New York. P&C may be served by service upon its registered agent, John E. Cay, IV, 609 Dancy Avenue, Savannah, Georgia 31419.

## Jurisdiction and Venue

5.     Jurisdiction and venue are proper in this Court under the facts and circumstances set forth herein.

6.     This Court has jurisdiction over this subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.     This Court has personal jurisdiction over Kane because he is a resident of Georgia.

8.     This Court has personal jurisdiction over P&C because it is registered to do business and maintains offices in Georgia.

9.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to the claim occurred in this district.

## Factual Allegations

### USI and the Insurance Brokerage Industry

10.     USI is one of the largest insurance brokerages in the United States and provides a full range of insurance, risk management, and other related services to thousands of clients nationwide. USI maintains an office in Atlanta, Georgia located at 1 Concourse Parkway NE, Suite 700, Atlanta, Georgia 30328.

11.    To provide these services, USI employs sales executives, commonly referred to in the insurance industry as "producers," who are responsible for managing USI's customer relationships, including maintaining relationships with existing customers, attracting and developing new customers, expanding current customer relationships, and planning, marketing, and developing future customer opportunities.

12.    The insurance brokerage field that USI occupies is an extremely competitive industry. An important part of USI's business is the relationships and goodwill that it forms with its clients. These relationships and goodwill are developed by hiring and training skilled personnel (including producers), and through those producers identifying and satisfying client needs and otherwise developing a solid reputation in the business community. Insurance brokerage companies, like USI, invest significantly in establishing and maintaining strong relationships with their clients.

13.    USI regularly conducts repeat business with its clients. For example, when a policy is set to expire, USI works with its client to evaluate renewal options. USI also works with its clients to identify cross-selling opportunities to place other types of insurance.

14.     USI relies on its Producers to maintain and enhance the goodwill of USI with respect to USI's clients and relationships with prospective clients. In the course of performing their duties for USI, Producers have access to and gain knowledge of confidential information about USI and its client accounts. USI also provides its Producers with significant training and resources as well as access to USI's clients.

15.     Consistent with this industry practice, in recognition of the importance of the relationship between employee and client, as a condition of their employment with USI, USI generally requires all its employees who develop and service insurance business to agree to certain duties owed to USI and to non-competition, non-solicitation, and other restrictive covenants that apply during the term of employment and for certain limited periods after the termination of employment.

**Kane's Employment with USI**

16.     In July 2018, USI offered Kane a position of employment as a Producer in USI's Atlanta, Georgia office. Kane accepted USI's offer and executed an Employment Agreement (the "Agreement"), agreeing to certain terms and conditions of employment. A true and correct copy of the Agreement is attached as Exhibit A.

17.     In his capacity as a Producer, Kane provided commercial insurance brokerage services to USI's clients, including servicing USI's clients located in and

around Atlanta. As a Producer, Kane was responsible for developing, maintaining, and enhancing relationships with USI's clients and prospective clients and for assisting USI's clients in meeting their insurance needs.

18.    Kane's position of Producer was a sales position responsible for new business sales revenue growth and for existing client revenue retention and growth based upon an assigned book of prospects and clients.

19.    In his role as a Producer, Kane had access to and received a substantial volume of USI's confidential information and trade secrets.

20.    Kane received access to a substantial volume of other information regarding USI's business operations and business strategy.

21.    This confidential information is valuable to the business of USI and could be used by competitors for their benefit and to USI's detriment.

22.    Kane has substantial relationships with prospective and existing clients of USI, customarily and regularly solicited for USI clients and prospective clients, and customarily and regularly engaged in making sales or obtaining orders or contracts for products or services to be performed by others.

23.    Kane is also in possession of selective or specialized skills, learning, or abilities and customer contacts and customer information and has obtained such

skills, learning, abilities, contacts, and information by reason of having worked for USI.

## The Employment Agreement

24.     Kane voluntarily entered into the Agreement with USI and received substantial compensation as a result of his employment with USI. By entering into the Agreement, he acknowledged and agreed that by commencing employment with USI, he received a direct financial benefit and other good and valuable consideration.

25.     In exchange for employment by USI and other good and valuable consideration, Kane agreed not to compete against USI with respect to certain clients and prospects during the term of his employment and for a two-year period thereafter.

26.     In Section 6.6 of the Agreement, Kane specifically agreed to the following:

> ***Non-Competition With Respect to Client Accounts and Active Prospective Clients.*** In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that, during the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer will refrain from carrying on any business in competition with the Company, directly or indirectly, with respect to any Client Account or Active Prospective Client in the Geographic Area. **"Carrying on any business in competition with the Company"** shall mean the sale of or providing any product or service that competes, or is reasonably anticipated to compete, in the same markets, with a product or service of the Company as to which Producer had a role in the sale, marketing, distribution, or

development in the last two (2) years of Producer's employment hereunder, or about which Producer acquired Confidential Information. For purposes of this Section 6.6, the term **"Geographic Area"** shall include any territory within a one hundred (100) mile radius of any Company facility in which Producer maintained an office during the last twelve (12) months of Producer's employment hereunder, including any counties in the Geographic Area in which Producer conducted business or where Client Accounts or Active Prospective Clients with whom Producer had material contact in the two (2) years prior to termination of Producer's employment hereunder are present. It is expressly agreed that this Section 6.6 is not intended to restrict or prohibit the ownership by Producer of stock or other securities of a publicly-held corporation in which Producer (a) does not possess beneficial ownership of more than five percent (5%) of the voting capital stock of such corporation and (b) does not participate in any management or advisory capacity[.]

(Agreement at § 6.6 ("Non-Compete Covenant").)

27.    Additionally, in exchange for employment by USI and other good and valuable consideration, Kane also agreed not to solicit, on behalf of a competitive business, clients and active prospective clients of USI during the term of his employment and for periods of two years and six months thereafter.

28.    In Section 6.5 of the Agreement, Kane specifically agreed to the following:

***Non-Solicitation of Clients and Active Prospective Clients.*** In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees:

(a) During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i)

solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment hereunder.

(b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity: (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of Producer's employment hereunder.

(Agreement at § 6.5 ("Non-Solicit Covenant").)

29.     Additionally, in Section 6.2 of the Agreement, Kane agreed that during his employment with USI and for a period of five years thereafter he would "not use or disclose any Confidential Information of" USI, except in limited approved circumstances, and that he would "also use reasonable efforts to prevent any prohibited use or disclosure by any other Person." (Agreement at § 6.2 ("Non-

Disclosure Covenant").) The Confidential Information that Kane agreed not to disclose includes, among other enumerated, nonexclusive, categories of information, "the identity, authority and responsibilities of key contacts and decision-makers employed by the Company's Client Accounts or Active Prospective Clients[.]" (Agreement at § 1(f).)

30.    In the Agreement, Kane expressly acknowledged and agreed that the terms and conditions in the Agreement are reasonable and necessary in order to protect USI's legitimate business interests, including USI's confidential information, goodwill, ongoing business, and relationships with clients, prospective clients, and employees. (Agreement at p. 2.)

31.    Additionally, in Section 6.8 of the Agreement, Kane expressly agreed that the time, geographic area, and scope of the limitations contained in Section 6 of the Agreement, including the Non-Compete Covenant and the Non-Solicit Covenant, are reasonable and necessary to protect USI's confidential information and goodwill.

**Kane's Resignation and Improper Competition**

32.    On November 20, 2020, Kane provided USI with his notice of voluntary resignation, with an effective date of January 15, 2021.

33.     On January 6, 2021, prior to the effective date of Kane's resignation, USI formally notified Kane of his ongoing contractual obligations to USI, including those set forth in Section 6 of the Agreement, and reminded him that those obligations would govern his conduct through and following his effective resignation date. A true and correct copy of the correspondence USI sent to Kane on January 6, 2021 is attached as Exhibit B.

34.     Shortly after the effective date of his resignation from USI, Kane became employed by and began to perform insurance brokerage services on behalf of P&C, a direct competitor of USI. According to an announcement P&C posted on its LinkedIn page in or around February 2021, Kane joined the Atlanta office of P&C as a Producer. This position is substantially similar to the position Kane held at USI. A true and correct copy of P&C's LinkedIn announcement regarding Kane is attached as Exhibit C.

35.     P&C, a "Competitive Business" as defined in the Agreement, competes with USI in the Atlanta area. As indicated by P&C's LinkedIn announcement, Kane is working for P&C in Georgia and will be doing business on P&C's behalf for clients and prospective clients located in Georgia, including in the Atlanta area.

36.     On information and belief, after Kane resigned from USI, he began, on behalf of P&C, to solicit, directly or indirectly, the business of one or more USI Client Accounts that Kane had serviced as a Producer for USI.

37.     On March 8, 2021, USI received a broker of record change letter dated March 4, 2021, providing notice that MWS Auto Services, Inc. ("Marietta Wrecker") was transferring its insurance brokerage relationship away from USI to P&C.

38.     Kane serviced Marietta Wrecker's account on behalf of USI while he was employed as a Producer in USI's Atlanta office. Marietta Wrecker is located at 950 Allgood Road, Marietta, Georgia 30062.

39.     Marietta Wrecker was the largest Georgia-based USI Client Account that Kane serviced as a Producer at USI. The Marietta Wrecker account generated over $100,000 in revenue for USI in the twelve months preceding Kane's resignation.

40.     On information and belief, the transfer of Marietta Wrecker's business from USI to P&C was effectuated by Kane through his direct and/or indirect solicitation of the business.

41.     Immediately after receiving the Marietta Wrecker BOR change letter, one of USI's practice group leaders in USI's Atlanta office called Frank Eldridge, a

former USI employee who currently runs the Atlanta office of P&C. During this call, Eldridge admitted that Marietta Wrecker moved its business to P&C in order for Kane to service Marietta Wrecker's account.

42.     Specifically, Eldridge claimed that Kane's key contact at Marietta Wrecker, and its decision-maker regarding the company's insurance needs and decisions, contacted Kane about moving Marietta Wrecker's business to P&C. Kane informed P&C's President about his discussions with Marietta Wrecker's decision-maker and coordinated a call that included P&C's President and Marietta Wrecker's decision-maker. After this call, Marietta Wrecker issued the BOR change letter.

43.     Additionally, Eldridge and P&C's President told USI representatives that Marietta Wrecker's decision-maker informed P&C that Marietta Wrecker was moving its business to P&C because of service issues at USI. Contrary to the representations of Eldridge and P&C's President, Marietta Wrecker's decision-maker told USI's representatives that he was not aware of any services issues regarding USI's service to Marietta Wrecker. Separately, on the same day, a Marietta Wrecker employee sent an email to USI thanking USI for its good service on a recent matter.

44.     During the call referenced above between Marietta Wrecker's decision-maker and USI representatives, Marietta Wrecker's decision-maker confirmed that

he was moving Marietta Wrecker's business to P&C because he wanted to continue working with Kane.

45.    USI informed P&C that Kane's soliciting and providing competitive services to Marietta Wrecker on behalf of P&C violates Kane's contractual obligations to USI. USI demanded that Kane honor his contractual obligations to USI and that Kane and P&C arrange for the rescission of the Marietta Wrecker BOR change letter.

46.    P&C did not arrange for the rescission of the Marietta Wrecker BOR change letter. Instead, approximately a week after USI requested that the BOR be rescinded, P&C's President made vague claims that P&C was "going to abide by the contract" and espoused a new position that Marietta Wrecker wanted to move its business to P&C regardless of whether Kane is involved. Notably, P&C's President has not stated that Kane will not directly or indirectly provide services to Marietta Wrecker at P&C. Moreover, P&C's recent claim that Marietta Wrecker wants to move to P&C regardless of whether Kane is involved directly contradicts Eldridge's and Marietta Wrecker's decision-maker's statements to USI representatives that he was moving the business to P&C because he wanted to follow Kane.

47.    Based on the above circumstances, USI reasonably believes that Kane has solicited or otherwise diverted or attempted to divert one or more USI Client

Accounts, and is improperly competing with USI with regard to Marietta Wrecker within the Geographic Area. USI reasonably believes that such conduct will continue absent judicial intervention.

48.     As a direct result of Kane's improper conduct, USI has already suffered damages since Kane's departure from USI.

49.     USI is now in a vulnerable position with the potential for continued loss of business and harm to its goodwill due to Kane's improper actions. The wholesale damage to USI, however, cannot be quantified as to the transfer of Client Accounts to a Competitive Business precipitated by one having detailed knowledge of confidential, proprietary, and trade secret information belonging to USI regarding these (and other) customers. Kane's actions have diminished (and will continue to diminish) USI's position in the marketplace and undermine its goodwill.

50.     Kane agreed in the Agreement that the services he rendered to USI as a Producer were "of a special, unique, and extraordinary character," that "it would be extremely difficult or impracticable to replace such services," and that any breach of the restrictive covenants contained in the Agreement "would result in irreparable harm to the business of [USI] for which money damages alone would not be adequate compensation." Kane agreed that, in addition to any other rights or remedies available at law, USI would be entitled to equitable relief, including,

without limitation, a temporary and permanent injunction, in the event Kane violated the restrictive covenants in the Agreement. (Agreement at § 8.)

51.    Kane's conduct has caused and threatens irreparable harm to USI for which USI has no adequate remedy at law. If Kane is not enjoined from his unfair competition, USI will suffer continuing, additional, and irreparable harm.

### Count One
### Breach of Non-Compete Covenant
### (Against Kane)

52.    USI restates and incorporates herein by reference the allegations contained in Paragraphs 1 through 51.

53.    The Agreement is a valid and enforceable contract and was in place at the time Kane voluntarily resigned from his employment with USI.

54.    The Non-Compete Covenant contained in Section 6.6 of the Agreement is reasonable and necessary to protect the legitimate business interests of USI.

55.    As set forth above, in the Non-Compete Covenant, Kane agreed, among other things, to refrain from carrying on any business in competition with USI with respect to certain Client Accounts in the Geographic Area for a period of two years after his employment ended.

56.    The information available to USI indicates that Kane has breached the Non-Compete Covenant by, among other things, participating in the transfer of

Marietta Wrecker's business from USI to P&C and providing products and services to Marietta Wrecker on behalf of P&C that compete, and are reasonably anticipated to compete, in the same markets, with products and services of USI.

57.     Marietta Wrecker's decision-maker informed USI that it was moving its business to P&C so that it could work with Kane.

58.     As a result of Kane's improper competition, USI has suffered, and is likely to continue to suffer, substantial injury, including in the form of lost business opportunities, lost profits, and damage to USI's goodwill from its employees, clients, and potential clients.

59.     Accordingly, USI is entitled to preliminary and permanent injunctive relief prohibiting Kane from continuing to breach his non-competition obligations in the Agreement and is entitled to an award of monetary damages in an amount to be proven at trial.

## Count Two
### Breach of Non-Solicit Covenant
### (Against Kane)

60.     USI restates and incorporates herein by reference the allegations contained in Paragraphs 1 through 59.

61.     The Agreement is a valid and enforceable contract and was in place at the time Kane voluntarily resigned from his employment with USI.

17

62.    The Non-Solicit Covenant contained in Section 6.5 of the Agreement is reasonable and necessary to protect the legitimate business interests of USI.

63.    As set forth above, in the Non-Solicit Covenant, Kane agreed, among other things, to refrain from indirectly or directly soliciting certain Client Accounts of USI for a period of two years after his employment ended.

64.    The information available to USI indicates that Kane has breached the Non-Solicit Covenant by, among other things, indirectly or directly soliciting (or attempting to solicit) business from one or more Client Account that he serviced while working for USI in competition with USI.

65.    Specifically, Kane's affirmative action of coordinating the discussion between P&C's President and Marietta Wrecker's decision-maker so that P&C's President could encourage and facilitate the transfer of Marietta Wrecker's business constitutes prohibited solicitation.

66.    As a result of Kane's improper solicitation, USI has suffered, and is likely to continue to suffer, substantial injury, including in the form of lost business opportunities, lost profits, and damage to USI's goodwill from its employees, clients, and potential clients.

67.    Accordingly, USI is entitled to preliminary and permanent injunctive relief prohibiting Kane from continuing to breach his non-solicitation obligations in

the Agreement and to an award of monetary damages in an amount to be proven at trial.

### Count Three
### Tortious Interference with Contract
### (Against P&C)

68.    USI restates and incorporates herein by reference the allegations contained in Paragraphs 1 through 67.

69.    The Agreement between USI and Kane is a valid and enforceable contract and was in place at the time Kane voluntarily resigned from his employment with USI.

70.    On information and belief, at all relevant times P&C was aware of contractual relationships between USI and its employees, including the valid Agreement with Kane.

71.    On multiple occasions in March 2021, USI informed P&C of Kane's contractual obligations to USI and notified P&C that Kane's conduct on behalf of P&C with respect to Marietta Wrecker violates Kane's contractual duties to USI.

72.    P&C's Branch Manager and Marietta Wrecker's key decision-maker both separately informed USI that Marietta Wrecker had moved its account to P&C to work with Kane. While P&C's President later made vague statements that it would "abide by the contract," those statements are contradicted by the statements of

Marietta Wrecker's decision-maker on the reason for the move and P&C's actions in participating in the solicitation of Marietta Wrecker's business.

73.    P&C has intentionally and unjustifiably interfered with USI's contractual relationship with Kane by aiding, abetting, encouraging, inducing, and otherwise causing and acting in concert with Kane to breach the contractual duties he owes to USI under the Agreement, including the duties owed under the Non-Compete Covenant and the Non-Solicit Covenant.

74.    P&C has acted improperly and without privilege in seeking to deprive USI of the valid and existing contractual rights for which it bargained when it hired Kane, and its actions exceed mere lawful competition.

75.    P&C wrongfully used USI's Confidential Information, including the identity and authority of USI's key contact and the decision-maker at Marietta Wrecker, in order to aid, abet, and facilitate Kane's solicitation of Marietta Wrecker and to induce Kane to compete with USI with respect to Marietta Wrecker in breach of his Agreement.

76.    P&C has acted purposefully and with malice with intent benefit itself and to injure USI in its contractual relations with employees, including Kane. P&C acted with knowledge of USI's rights and with the intent to interfere with those rights.

77.     As a result of P&C's non-privileged and intentional interference, Kane has breached and continues to breach the contractual obligations he owes to USI.

78.     P&C's conduct has directly and proximately caused injury, loss, and damage to USI's business, and will result in immediate and irreparable injury, loss, and damage to USI.

79.     USI has no adequate remedy at law and is entitled to preliminary and permanent injunctive relief prohibiting further unlawful conduct by P&C.

80.     USI is also entitled to and requests an award of monetary damages for the damages caused by P&C's conduct and to punitive damages in an amount to be proven at trial.

## Count Four
**Tortious Interference with Business Relations**
**(Against P&C)**

81.     USI restates and incorporates herein by reference the allegations contained in Paragraphs 1 through 80.

82.     USI has advantageous business relationships with its valuable Client Accounts.

83.     On information and belief, at all relevant times P&C was aware of these advantageous business relationships.

84.     On information and belief, at all relevant times P&C was aware of Kane's contractual obligations to USI, which restrict him for a limited and reasonable period of time from soliciting or improperly competing with USI with respect to certain Client Accounts.

85.     On multiple occasions in March 2021, USI advised P&C that Kane's conduct improperly threatened USI's relationships with valuable Client Accounts.

86.     P&C's Branch Manager and Marietta Wrecker's key decision-maker both separately informed USI that Marietta Wrecker had moved its account to P&C to work with Kane. While P&C's President later made vague statements that it would "abide by the contract," those statements are contradicted by the statements of Marietta Wrecker's decision-maker on the reason for the move and P&C's actions in participating in the solicitation of Marietta Wrecker's business.

87.     P&C has interfered with USI's valuable business relationships by aiding, abetting, encouraging, inducing, or otherwise causing Kane to provide services to certain Client Accounts in violation of his valid and binding obligations to USI.

88.     P&C wrongfully used USI's Confidential Information, including the identity and authority of USI's key contact and the decision-maker at Marietta Wrecker, in order to aid, abet, and facilitate Kane's solicitation of Marietta Wrecker

and to induce Kane to compete with USI with respect to Marietta Wrecker in breach of his Agreement.

89.     P&C has acted improperly and without privilege in seeking to disgorge USI of its valuable business relationships, and its actions exceed mere lawful competition.

90.     P&C has acted purposefully and with malice with intent to benefit itself and to injure USI in its business relations with Client Accounts that Kane managed or serviced before his resignation from USI. P&C acted with knowledge of USI's rights and with the intent to interfere with those rights.

91.     As a result of P&C's non-privileged and intentional interference, at least one Client Account has discontinued its business relationship with USI. USI's business relationships with the Client Account that Kane serviced before his employment with USI ended would in all probability have continued but for P&C's interference.

92.     P&C's conduct has directly and proximately caused injury, loss, and damage to USI's business, and will result in immediate and irreparable injury, loss, and damage to USI.

93.     USI has no adequate remedy at law and is entitled to preliminary and permanent injunctive relief prohibiting further unlawful conduct by P&C.

94.     USI is also entitled to and requests an award of monetary damages for the damages caused by P&C's conduct and to punitive damages in an amount to be proven at trial.

### Count Five
### Attorneys' Fees
### (Against Kane and P&C)

95.     USI restates and incorporates herein by reference the allegations contained in Paragraphs 1 through 94.

96.     Defendants have acted in bad faith, been stubbornly litigious, and has caused USI unnecessary trouble and expense in refusing to honor his valid contractual obligations to USI.

97.     As a result of Defendants' wrongful conduct described herein, pursuant to O.C.G.A. § 13-6-11, USI is entitled to its costs and expenses, including reasonable attorneys' fees.

### Request for Preliminary and Permanent Injunctive Relief

98.     USI restates and incorporates herein by reference the allegations contained in Paragraphs 1 through 97.

99.     As set forth above, Kane has breached and is breaching his contractual non-competition and non-solicitation obligations to USI, and P&C has interfered and is interfering with USI's contractual and business relationships.

100.   Kane's conduct in actively competing with USI and soliciting USI's Client Accounts and P&C's conduct in inducing, encouraging, and facilitating Kane's improper competition and solicitation demonstrate that, if not enjoined, Defendants are likely to continue to cause USI substantial and irreparable harm.

101.   More specifically, as described above, Defendants are actively in the process of transferring at least one USI Client Account from USI to P&C so that, according to the Client Account's decision-maker, the account can be serviced by Kane.

102.   USI does not have an adequate remedy at law for the harm Defendants have already caused and are likely to continue to cause, including the loss of and damage to the goodwill of USI's employees, clients, and potential clients. The amount of such damages would be significant, but difficult to determine specifically.

103.   Kane agreed in the Agreement that, under the present circumstances, USI is entitled to injunctive relief in order to enforce the restrictive covenants in the Agreement. (Agreement at § 8.)

104.   The public interest will not be harmed if an injunction is granted.

105.   Accordingly, USI is entitled to preliminary and permanent injunctive relief enjoining Kane from continuing to breach the Non-Compete Covenant and the

Non-Solicit Covenant and enjoining P&C from interfering with USI's contractual and business relationships with Kane and with USI's clients.

## Jury Trial Demand

USI demands a jury trial on all issues on which the law entitles it to a trial by jury.

## Prayer for Relief

WHEREFORE, USI respectfully requests the following relief:

(a)    That the Court enter judgment in favor of USI and against Defendants on all counts in an amount to be determined at trial and award damages to USI, including, but not limited to, compensatory damages, punitive damages, attorneys' fees, costs, and interest;

(b)    That the Court enter an injunction against Defendants requiring compliance with the Agreement, including barring Kane from, directly or indirectly, soliciting the business of any Client Account or competing with USI with respect to any Client Account within the Geographic Area, as those capitalized terms are defined in the Agreement; and

(c)    That the Court award such other and further relief as it deems just and proper.

Respectfully submitted this 19th day of March, 2021.

**PARKER HUDSON RAINER & DOBBS LLP**

*/s/ Nancy H. Baughan*
Nancy H. Baughan
Georgia Bar No. 042575
John H. Elliott
Georgia Bar No. 350612
303 Peachtree Street, NE, Suite 3600
Atlanta, Georgia 30303
Phone: (404) 523-5300
Fax: (404) 522-8409
nhb@phrd.com; jell@phrd.com

*Counsel for USI Insurance Services LLC*