# EXHIBIT A

# EMPLOYMENT AGREEMENT

EMPLOYMENT AGREEMENT ("**Agreement**"), effective as of July 23, 2018 (the "**Effective Date**"), by and between USI Insurance Services LLC ("**Company**"), a Delaware limited liability company, and Christopher Kane ("**Producer**").  The Company and Producer are referred to hereinafter each individually as a "**Party**" and collectively as the "**Parties**".

## RECITALS

WHEREAS, the Company is a subsidiary of USI Advantage Corp. ("**USI**"), a Delaware corporation.

WHEREAS, the Company desires to employ Producer on the terms and conditions herein and Producer is willing to accept employment on such terms and conditions.

WHEREAS, Producer's covenants herein are a material inducement for the Company to enter into this Agreement.

WHEREAS, Producer acknowledges and agrees that by virtue of employment hereunder, Producer will receive a direct financial benefit and other good and valuable consideration.

WHEREAS, by virtue of employment hereunder, Producer:

(a) will have access to, and gain knowledge of, Confidential Information of the Company and the USI Companies, the unauthorized use and/or disclosure of which could cause material and irreparable harm to the Company;

(b) will have significant responsibility for maintaining and enhancing the Goodwill of the Company with respect to the Company's Client Accounts and relationships with prospective clients and will have training and access to the Company's customers and suppliers and, as such, will develop close and direct relationships with such customers and suppliers;

(c) will develop close and direct relationships with the Company's officers, directors, partners, employees, agents, suppliers, licensees, and/or other business relations;

(d) will benefit from the Company's investment of time, money and trust in Producer and will gain a high level of inside knowledge, influence, credibility, notoriety, fame, reputation or public persona as a representative or spokesperson of the Company, and, as a result, will have the ability to harm or threaten the Company's legitimate business interests;

(e) will make use of Producer's significant skills, training and experience; and

DocuSign Envelope ID: A94FAC2E-29D0-41FD-A635-85E2509D7667

(f) for these and other reasons, will render services to the Company that Producer acknowledges are special, unique or extraordinary.

WHEREAS, Producer acknowledges and agrees that the Company (on behalf of itself and the USI Companies) has a reasonable, necessary and legitimate business interest in protecting its own and the USI Companies' assets, Confidential Information, Client Accounts, relationships with Active Prospective Clients, Goodwill, employee relationships, and ongoing business, and that the terms and conditions set forth below are reasonable and necessary in order to protect these legitimate business interests.

NOW THEREFORE, in consideration of the recitals, representations, warranties, covenants, and agreements contained herein, and for other good and valuable consideration, including Producer's employment with the Company, the receipt and adequacy of which are conclusively acknowledged, the Parties, intending to become legally bound, agree as follows:

**AGREEMENT**

1. **DEFINITIONS**.  Capitalized terms not defined elsewhere herein shall have the following meanings ascribed to them, which the Company may modify from time to time:

    (a) "**Active Prospective Client**" means any Person or group of Persons the Company specifically solicited or had documented plans to solicit within the last six (6) months of Producer's employment hereunder.

    (b) "**Client Account**" means the account of any client (including, without limitation, any retail insurance agent or broker, individual insured, association and any member thereof, and any insurance carrier or other entity to the extent third party administration claims processing or underwriting is performed by a USI Company for such carrier or other entity) which is or was serviced by a USI Company in connection with such USI Company's business, regardless of whether such services are provided by, or through the licenses of a USI Company or any shareholder, employee or agent of a USI Company.

    (c) "**Coded to Producer**" means all policies and other business coded to Producer, as determined in good faith by the Company based on standards generally used in the insurance industry.  In the event of a dispute it shall be the Company's sole and absolute discretion to determine the coding attributable to Producer.

    (d) "**Competitive Business**" means any Person engaged in the production, distribution, marketing or sale of a Competitive Product.  Where a Competitive Business is part of a larger business involving both competitive and non-competitive products, the terms of this Agreement shall only apply to that part of the business which involves the production, distribution, marketing or sale of a Competitive Product.

(e) "**Competitive Product**" means any product or service, in existence, that competes, or is reasonably anticipated to compete, in the same markets with a product or service of the USI Companies, in existence, which Producer or the Company has sold, marketed, distributed or developed in the last two (2) years of Producer's employment with the Company, or about which Producer has acquired Confidential Information.

(f) "**Confidential Information**" means any information of the Company or a USI Company that is not generally available to the public (unless such information has entered the public domain and become available to the public through fault of the Party to be charged hereunder), including but not limited to:  (i) the identity, authority and responsibilities of key contacts and decision-makers employed by the Company's Client Accounts or Active Prospective Clients; (ii) types, terms and conditions of coverage and particularized insurance needs, requirements, risk specifications, preferences, expiration dates, claims and loss histories, and commission rates, fees and premiums of the Company's Client Accounts or Active Prospective Clients; (iii) terms and conditions of benefits and compensation plans of the Company's Client Accounts or Active Prospective Clients; (iv) information furnished to the Company in confidence by any Client Account or Active Prospective Client; (v) business plans, marketing strategies, and pricing structure, criteria and formulae for insurance and benefits products and claims management, and unpublished financial data and statements of the Company and its corporate affiliates; (vi) lists of the Company's Client Accounts or Active Prospective Clients, and any analyses and compilations thereof; (vii) data, analyses, lists, and business methodologies regarding prospective employees, candidates or Company hiring targets of the Company; (viii) compilations and lists of names and other personally identifiable information regarding Company employees; (ix) information that is password-protected; (x) all internal memoranda and other office records, including electronic and data processing files and records; (xi) all other proprietary information, including any information contained within a proprietary database and workbook product binders including without limitation OMNI Solutions Workbooks, OMNI Library Pages, OMNI Case Studies, and other OMNI Work Product; and (xii) all other information that constitutes a trade secret under applicable law.

(g) "**Goodwill**" means the competitive advantage, including the expectation of new and/or continued patronage from Client Accounts and Active Prospective Clients based on the Company's investment in repeated contacts, business transactions, Confidential Information, and other efforts to develop lasting relationships.

(h) "**Net Commissions and Fees**" means all commissions and fees received and actually collected by the Company, specifically on a policy Coded to Producer, less payments to external service providers such as, but not limited to vendors and value-added service providers, and/or to other USI Companies, and any sponsorships and/or charitable contributions made to a client by the Company, unless otherwise provided

for by local USI practice. "Net Commissions and Fees" shall not include any overrides or profit-sharing; interest on premiums on deposit; or contingent, bonus, excess, supplemental, non-standard, annually computed, non-specific volume based, or any other similar commissions or fees.

(i) "**New**" means any policy lines of coverage for a new client or any new policy lines of coverage for an existing client written by the Company or the other USI Companies, as the case may be. New will not encompass any client for which similar coverage was "In-Force" in the previous twelve (12) months and such business will be considered Renewal business. For policies with a coverage period of more than twelve (12) months, New shall be determined by the Company in accordance with the Company's policies in effect at such time.

(j) "**Person**" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a limited liability company, or a governmental entity (or any department, agency, or political subdivision thereof).

(k) "**New Business Appointment**" means a meeting with an Active Prospective Client, provided: (i) such meeting is documented in advance in CRM with a completed OMNI; (ii) such Active Prospective Client, it converted into a Client Account, would be expected to generate annual Net Commissions and Fees that satisfy the minimum account revenue in Section 3.5(f); and (iii) such Active Prospective Client has not been credited as a New Business Appointment within the past twelve (12) months.

(l) "**Producer's Book of Business**" means the annual Net Commissions and Fees received by the Company on Client Accounts Coded to Producer.

(m) "**Renewal**" means the second and any subsequent year of any New coverage. For policies with a coverage period of more than twelve (12) months, Renewal shall be determined by the Company in accordance with the Company's policies in effect at such time.

(n) "**USI Business**" means the businesses provided by the USI Companies, including, without limitation, insurance agency and brokerage, and related insurance services.

(o) "**USI Companies**" or "**USI Company**" means USI Advantage Corp., a Delaware Corporation, its subsidiaries (including the Company), and any entity under the control (as defined in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended, without regard to whether any party is a "registrant" under such Act) of USI, and any of their successors or assigns.

2. **POSITION, RESPONSIBILITIES AND TERM**

2.1. ***Position and Responsibilities***. On the terms and conditions in this Agreement, the Company shall employ Producer as a Producer. Producer shall perform all services and duties customarily attendant to such position, including the goals outlined in any applicable Producer expectation form as amended from time to time, and such other services and duties commensurate with such position as prescribed from time to time by Producer's Regional CEO or his/her designee (hereinafter, the "**Regional CEO**"). Nothing in this Agreement shall confer upon Producer any right to continued employment hereunder.

2.2. ***Insurance Licenses***. Producer shall obtain and retain the proper licenses for all lines of insurance solicited and serviced by Producer. Notwithstanding anything to the contrary in this Agreement, Producer acknowledges Producer is not entitled to any commissions for sales or servicing of policies within a line of insurance if Producer is not properly licensed for such line of insurance.

2.3. ***No Conflicts of Interest***. During Producer's employment hereunder, Producer agrees not to accept other employment or perform any activities or services that would be inconsistent with this Agreement or would interfere with or present a conflict of interest concerning Producer's employment with the Company. Producer agrees to comply with all business practices and ethical conduct requirements set forth in writing by USI and/or the Company in employee manuals and other publications.

2.4. ***Duty of Loyalty***. Producer acknowledges a duty of loyalty to the Company and agrees to use his/her best efforts to faithfully, diligently and completely perform all duties and responsibilities hereunder in furtherance of the business of the USI Companies.

2.5. ***Term***. Producer's employment hereunder shall commence on the Effective Date and continue until terminated pursuant to Section 7 (the "**Term**").

3. **COMPENSATION AND BENEFITS**

    3.1. ***Base Salary Through Conversion***. From the Effective Date through (a) Producer's first four (4) calendar years of employment hereunder (i.e. through December 31, 2021) (or a later date in the Company's discretion) or (b) until the date on which Producer validates his/her Base Salary as determined by the Company (e.g. Producer's Book of Business exceeds four (4) times an amount equal to Producer's Base Salary plus the maximum annual New Business Appointment Bonus ($24,000) (or a later date in the Company's discretion), whichever occurs first (hereinafter "**Producer's Conversion Date**"), to the extent Producer remains employed hereunder, the Company agrees to pay Producer a base salary in the annual amount of One Hundred Thousand Dollars ($100,000) ("**Base Salary**"); provided, however, the Company may adjust Producer's Base Salary upward or downward in its discretion and/or pursuant to Company polices as amended from time to time. The Base Salary will be payable in equal installments in accordance with the Company's normal payroll practices.

    3.2. **New Business Appointment Bonus Through Conversion**. From the Effective Date through Producer's Conversion Date, to the extent Producer remains employed hereunder, the Company agrees to pay Producer a bonus equal to Two Thousand Dollars ($2,000) for each calendar month in which Producer conducts and attends at least five (5) New Business Appointments in such month (or at least fifteen (15) New Business Appointments for the prior three (3) month period including such month) (the **"New Business Appointment Bonus"**) provided that (i) the median amount of the annual Net Commissions and Fees expected from the five (5) or more monthly (or fifteen (15) or more for the prior three (3) month period) qualified Active Prospective Clients is at least Twenty Thousand Dollars ($20,000); and (ii) a Practice Leader must "ride along" with Producer for at least two (2) of the five (5) or more monthly first appointments (or for at least six (6) of the fifteen (15) or more first appointments for the prior three (3) month period); and (iii) at least two (2) or more of the monthly first appointments (or at least six (6) of the fifteen (15) or more first appointments for the prior three (3) month period) that include a Practice Leader "ride along" must be opportunities that have expected annual Net Commissions and Fees of at least Twenty Thousand Dollars ($20,000).

    (a) During the period beginning from the Effective Date through the end of the first full calendar month of employment, only, Producer will not have to satisfy the requirements in Sections 3.2 (i), (ii) and (iii), above, for the New Business Appointment Bonus, and will receive a New Business Appointment Bonus of $2,000 for such period, which will be paid on the first regular payroll following the completion of the first full calendar month of employment. Thereafter, the Producer must satisfy the requirements in Sections 3.2 (i), (ii) and (iii), above, for the New Business Appointment Bonus.

    (b) Each New Business Appointment Bonus, if any, shall be due and payable no later than thirty (30) days after each respective monthly bonus period; provided, however, Producer shall not earn or receive any bonus herein unless Producer is still actively employed hereunder on the respective bonus payment date.

    (c) If Producer fails to meet all requirements required to remain on Producer funding per the Company policy, as amended from time to time, then Producer will no longer be eligible to earn or receive any New Business Appointment Bonus.

    3.3. **Production Bonus Through Conversion**. From the Effective Date through Producer's Conversion Date, to the extent Producer remains employed hereunder, Producer shall be eligible for the bonuses herein (the "**Production Bonuses**"). Each Production Bonus, if any, shall be due and payable as soon as it can be reasonably calculated but no later than sixty (60) days after each respective bonus period; provided, however, Producer shall not earn or receive any bonus herein unless Producer is still actively employed hereunder on the respective bonus payment date.

(a) During calendar year 2018 or through Producer's Conversion Date, whichever occurs first, if the annual Net Commissions and Fees received by the Company on Client Accounts for New and Renewal policies Coded to Producer as the sole originating/selling and sole servicing producer exceed one hundred percent (100%) of an amount equal to Producer's pro-rated average annual Base Salary plus the pro-rated maximum annual New Business Appointment Bonus Amount for such calendar year (such calculation resulting in the "2018 Threshold") , the Company shall pay Producer, subject to the minimum account threshold in Section 3.5(f) and the adjustments in Sections 3.5(g) to 3.5(i), a bonus equal to thirty percent (30%) of such Net Commissions and Fees that exceed the 2018 Threshold.

(b) During calendar year 2019 or through Producer's Conversion Date, whichever occurs first, if the annual Net Commissions and Fees received by the Company on Client Accounts for New and Renewal policies Coded to Producer as the sole originating/selling and sole servicing producer exceed one hundred percent (100%) of an amount equal to Producer's average annual Base Salary plus the maximum annual New Business Appointment Bonus Amount for such calendar year (such calculation resulting in the "2019 Threshold"), the Company shall pay Producer, subject to the minimum account threshold in Section 3.5(f) and the adjustments in Sections 3.5(g) to 3.5(i), a bonus equal to thirty percent (30%) of such Net Commissions and Fees that exceed the 2019 Threshold.

(c) During calendar year 2020 or through Producer's Conversion Date, whichever occurs first, if the annual Net Commissions and Fees received by the Company on Client Accounts for New and Renewal policies Coded to Producer as the sole originating/selling and sole servicing producer exceed two hundred percent (200%) of an amount equal to Producer's average annual Base Salary plus the maximum annual New Business Appointment Bonus Amount) for such calendar year (such calculation resulting in the "2020 Threshold"), the Company shall pay Producer, subject to the minimum account threshold in Section 3.5(f) and the adjustments in Sections 3.5(g) to 3.5(i) a bonus equal to thirty percent (30%) of such Net Commissions and Fees that exceed the 2020 Threshold.

(d) During calendar year 2021 or through Producer's Conversion Date, whichever occurs first, if the annual Net Commissions and Fees received by the Company on Client Accounts for New and Renewal policies Coded to Producer as the sole originating/selling and sole servicing producer exceed three hundred percent (300%) of an amount equal to Producer's average annual Base Salary plus the maximum annual New Business Appointment Bonus Amount) for such calendar year (such calculation resulting in the "2021 Threshold"), the Company shall pay Producer, subject to the minimum account threshold in Section 3.5(f) and the adjustments in Sections 3.5(g) to 3.5(i), a bonus equal to thirty percent (30%) of such Net Commissions and Fees that exceed the 2021 Threshold.

3.4. ***Draw After Conversion***.  Commencing after Producer's Conversion Date, the Company agrees to pay Producer commissions, calculated pursuant to Section 3.5, and a recoverable draw against such future commissions in an amount determined by the Company based on Producer's Book of Business ("**Draw**"); provided, however, the Company may adjust Producer's Draw upward or downward in its discretion to fairly reflect the commissions Producer will likely earn based on Producer's Book of Business.  The Draw shall be earned and offset by commissions earned by Producer pursuant to this Agreement.  The Draw will be payable in equal installments by the Company (or another USI Company designated by the Company) according to its normal payroll practices.

3.5. ***Calculation of Commissions***.  Commencing after Producer's Conversion Date, the Company agrees to pay Producer commissions calculated in accordance with the following policies:

(a) Forty percent (40%) of annual Net Commissions and Fees received by the Company on Client Accounts for New policies (except thirty percent (30%) on New Surety business, Builders Risk business, and WRAP products):  (i) invoiced and effective on or after Producer's Conversion Date; and (ii) assigned and Coded to Producer as the sole originating/selling and sole servicing producer in accordance with the Company's producer compensation policies.

(b) Twenty-five percent (25%) of annual Net Commissions and Fees received by the Company on Client Accounts for Renewal policies (except thirty percent (30%) on Renewal Surety business, Builders Risk business, and WRAP products, and zero percent (0%) on Renewals of personal lines policies):  (i) invoiced and effective on or after Producer's Conversion Date; and (ii) assigned and Coded to Producer as the sole originating/selling and sole servicing producer in accordance with the Company's producer compensation policies.

(c) Fifteen percent (15%) of annual Net Commissions and Fees received by the Company on Client Accounts for policies:  (i) transferred by the Company on or after Producer's Conversion Date; and (ii) assigned and Coded to Producer as servicing producer (but not originating/selling producer) in accordance with the Company's producer compensation policies.

(d) An amount determined on a case by case basis by the Company for Client Accounts where a substantial portion of fee based revenue is attributable in whole or part to Producer's efforts as an originating/selling or servicing producer.

(e) An amount determined by the Company's policies then in effect on Client Accounts, except for transferred business in Section 3.5(c), for which Producer is not both the sole originating/selling producer and the sole servicing producer.

(f) No commission will be paid on Client Accounts Coded to Producer that generate annual Net Commissions and Fees of less than Ten Thousand Dollars ($10,000) on commercial property and casualty, Ten Thousand Dollars ($10,000) on employee benefits. There is no minimum on personal lines.

(g) Producer's commissions shall be reduced by payments to co-brokers, sub-brokers, and sub-producers (including commissions and fees), referral fees, and return commissions, so that the Company's total payments to all Persons from the Net Commissions and Fees do not exceed any applicable maximum commission percentages under Company policy as amended from time to time.

(h) Producer's commissions shall be reduced by, and Producer shall have an ongoing duty to return to the Company, any commissions previously paid to Producer on premiums or fees subsequently refunded or not collected by the Company. Producer shall be subject to any Company policies regarding charges to and/or deductions from salary and/or commissions in effect at the time such salary and/or commissions are determined. Producer shall also be subject to any Company policies, as amended from time to time, regarding bad debts and write-offs from clients that require reimbursement from Producer.

(i) Producer's commissions shall not be considered earned until all charges and/or deductions have been made pursuant to this Agreement and the Company's compensation policies. In addition, such commissions only become earned by Producer if: (i) the business transaction is completed during Producer's employment hereunder; and (ii) Producer is still employed hereunder on the date the Company receives such commissions.

3.6. **Payment of Commissions**. Commencing after Producer's Conversion Date, the Company shall calculate, no less often than quarterly, commissions earned by Producer and received by the Company. Earned commissions shall be offset against: (a) Producer's Draw for the prior periods; and (b) if applicable, expenses reimbursed in excess of Producer's expense allowance. Earned commissions in excess of such offsets, if any, shall be due and payable as soon as they can be reasonably calculated but no later than sixty (60) days after each quarter. If Producer's Draw and any other applicable offsets for such period exceed Producer's earned commissions, such shortfall may be offset against installments of Producer's Draw for subsequent quarters and Producer's Draw for the subsequent quarter may be reduced commensurate with current earned commission levels to minimize the risk of a shortfall in the new period.

3.7. **Commissions Upon Termination**. Producer acknowledges that Producer shall not be eligible to earn or receive any commissions received by the Company after Producer is no longer employed hereunder because Producer will no longer be performing the essential duties of Producer's position which form the basis for such compensation. Accordingly, if Producer's employment hereunder is terminated for any reason, including death, the

Company shall calculate commissions earned by Producer and received by the Company prior to Producer's termination.  Earned commissions shall be offset against:  (a) Producer's Draw for the prior periods; and (b) if applicable, expenses reimbursed in excess of Producer's expense allowance.  Earned commissions in excess of such offsets, if any, shall be due and payable as soon as they can be reasonably calculated but no later than sixty (60) days after the effective date of Producer's termination.  No further commissions shall be due or payable after such payment.  If Producer's Draw and any other applicable offsets for such period exceed Producer's earned commissions, such shortfall shall be due and payable to the Company within sixty (60) days after the effective date of Producer's termination.

3.8. **Right to Modify**.  The Company may modify the policies and terms in Section 3, including any commission percentages or other amounts herein, by giving at least thirty (30) days written notice to Producer.  Producer's continued employment hereunder following any change shall be considered sufficient consideration for, and acceptance of, such change.

3.9. **Tax Withholding**.  The Company shall deduct from all payments and benefits under this Agreement any taxes required to be withheld and/or paid pursuant to federal, state and local taxing authorities.

3.10. **Benefits**.  Producer shall be entitled to benefits, other than paid time off, on the same terms generally provided to similar employees of the Company.  Notwithstanding the foregoing, nothing contained in this Agreement shall require the Company to establish, maintain or continue any of the benefit plans already in existence or hereafter adopted for producers of the Company, or restrict the right of the Company to amend, modify or terminate such benefit plans.

3.11. **Paid Time Off**.  Producer shall not accrue or be entitled to any paid time off ("**PTO**") under this Agreement or the Company's PTO policy.

4. **EXPENSES**.  The Company shall reimburse Producer, in accordance with and subject to Company and USI policy, as amended from time to time, for expenses reasonably and properly incurred by Producer in connection with the performance of Producer's duties hereunder and the conduct of the business of the Company.

5. **COMPANY PROPERTY**.  Producer acknowledges and agrees all Confidential Information of the Company and/or USI Companies, which Producer has access to, receives or generates in the course of providing any USI Business, shall be the sole property of the Company and/or USI Companies, as the case may be, and shall remain with the Company and/or USI Companies upon termination of Producer's employment.  Producer further acknowledges and agrees that Producer has no ownership rights to any Client Accounts and that the Client Accounts are owned by the Company and/or USI Companies.

6. **COVENANTS**

6.1. **Confidential Information**.  The Company agrees to provide Producer with Confidential Information to assist Producer in the course and scope of Producer's duties.  Producer acknowledges that the Company's agreement to provide this Confidential Information to Producer is in consideration for, and ancillary to, Producer's agreement to the other terms in this Agreement.

6.2. **Confidentiality During and Following Term**.  During the Term and for five (5) years after Producer is no longer employed hereunder, for any reason, Producer will not use or disclose any Confidential Information of the Company or any USI Company except:  (a) in the normal course of business on behalf of the Company; (b) with the prior written consent of such USI Company; or (c) to the extent necessary to comply with the law or the valid order of a court of competent jurisdiction, in which event Producer shall notify such USI Company as promptly as practicable (and, if possible, prior to making such disclosure).  Producer will also use reasonable efforts to prevent any prohibited use or disclosure by any other Person.  Nothing in this Agreement shall prohibit Producer from disclosing data or information which has been independently developed and disclosed by others or which has otherwise entered the public domain through lawful means.

6.3. **Defend Trade Secrets Act Required Notice**.  Notwithstanding anything in this Agreement to the contrary, pursuant to the Defend Trade Secrets Act of 2016, Producer acknowledges and understands that:

(a) An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that:  (i) is made (A) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney, and (B) solely for the purpose of reporting or investigating a suspected violation of law; or (ii) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(b) An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual:  (i) files any document containing the trade secret under seal; and (ii) does not disclose the trade secret, except pursuant to court order.

6.4. **Assignment and Ownership of Intellectual Property**.  Producer acknowledges and agrees that any Intellectual Property (as defined herein) shall be "works made for hire" under the United States Copyright Act and that the Company shall be deemed the inventor, author and exclusive owner thereof together with all related intellectual property rights and exploitation rights for the longest period permitted by law.  To the extent, if any, that any Intellectual Property is not deemed a "work made for hire" or that Producer is otherwise deemed to retain any rights, title or interest in or to any Intellectual Property, Producer hereby irrevocably transfers and assigns to the Company all rights, title and interest Producer may have or acquire to such Intellectual Property, without additional compensation, and hereby

irrevocably waives any so-called moral rights of authors or other special rights which Producer may have or acquire therein.  "**Intellectual Property**" means any advertisements, images, slogans, logos, designs, sketches, mock-ups, samples, concepts, ideas, inventions, original works of authorship, computer software programming of any nature, discoveries, techniques, copyrights, patents, trademarks or the like, conceived or made by Producer in whole or in part during the Term:  (a) using Producer's relationship with the Company; (b) using Confidential Information or the Company's time, resources, facilities, supplies, equipment or trade secrets; (c) relating to the Company's present or future business; or (d) resulting from Producer's work for the Company.

6.5. **Non-Solicitation of Clients and Active Prospective Clients**.  In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees:

(a) During the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity:  (i) solicit or attempt to solicit services in competition with the Company to any Client Account; (ii) divert or attempt to divert services away from the Company with respect to any Client Account; (iii) consult for any Client Account with respect to services in competition with the Company; (iv) sign a broker of record letter with any Client Account to provide services in competition with the Company; or (v) induce the termination, cancellation or non-renewal of any Client Account; in each case with respect to any Client Account that Producer managed or regularly serviced and/or about which Producer obtained Confidential Information on behalf of the Company within the last two (2) years of Producer's employment hereunder.

(b) During the Term and for six (6) months after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity:  (i) solicit or attempt to solicit services in competition with the Company to any Active Prospective Client; (ii) divert or attempt to divert services away from the Company with respect to any Active Prospective Client; (iii) consult for any Active Prospective Client with respect to services in competition with the Company; or (iv) sign a broker of record letter with any Active Prospective Client to provide services in competition with the Company; in each case with respect to any Active Prospective Client that Producer solicited and/or about which Producer obtained Confidential Information on behalf of the Company within the last six (6) months of Producer's employment hereunder.

6.6. **Non-Competition With Respect to Client Accounts and Active Prospective Clients**.  In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees that, during the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer will refrain from carrying on any business in competition with the Company, directly or indirectly, with respect to any Client Account or Active Prospective Client in the Geographic Area. "**Carrying on any**

**business in competition with the Company**" shall mean the sale of or providing any product or service that competes, or is reasonably anticipated to compete, in the same markets, with a product or service of the Company as to which Producer had a role in the sale, marketing, distribution, or development in the last two (2) years of Producer's employment hereunder, or about which Producer acquired Confidential Information. For purposes of this Section 6.6, the term "**Geographic Area**" shall include any territory within a one hundred (100) mile radius of any Company facility in which Producer maintained an office during the last twelve (12) months of Producer's employment hereunder, including any counties in the Geographic Area in which Producer conducted business or where Client Accounts or Active Prospective Clients with whom Producer had material contact in the two (2) years prior to termination of Producer's employment hereunder are present.  It is expressly agreed that this Section 6.6 is not intended to restrict or prohibit the ownership by Producer of stock or other securities of a publicly-held corporation in which Producer (a) does not possess beneficial ownership of more than five percent (5%) of the voting capital stock of such corporation and (b) does not participate in any management or advisory capacity

6.7. ***Non-Interference With Employees***.  In consideration of Producer's employment hereunder, and for other good and valuable consideration, Producer agrees, during the Term and for two (2) years after Producer is no longer employed hereunder, for any reason, Producer shall not, directly or indirectly, on behalf of any Competitive Business in any capacity:  (a) solicit the employment, consulting or other services of, or hire, any other employee of the Company; or (b) otherwise induce any such employees to leave the Company's employment or breach an employment agreement therewith; in each case with respect to any employee of the Company with whom Producer worked or obtained knowledge about as a result of Producer's employment with the Company.

6.8. ***Purpose of Restrictions***.  The purpose of the covenants in this Agreement is to protect the Company's assets and to prevent any Competitive Business from gaining an unfair advantage from Producer's knowledge of the Company's Confidential Information or misuse of the Company's Goodwill.  Producer agrees that the time, geographic and scope limitations herein are reasonable and necessary to protect the Company's Confidential Information and Goodwill.

6.9. ***Modification***.  If a court finds any covenants in this Agreement exceed the permissible time, geographic or scope limitations, such covenants shall be reformed to the maximum permissible time, geographic or scope limitations.  If a court refuses to enforce any of these covenants, in whole or in part, the unenforceable terms shall be eliminated ("blue penciled") or otherwise modified to the extent necessary to permit the remaining terms to be enforced.  The Company may unilaterally limit the scope of these covenants.

6.10. ***Independent Enforcement***.  Each of the covenants in this Agreement shall be construed as an agreement independent of (i) any other agreements or (ii) any other provision in this Agreement, and the existence of any claim or cause of action by Producer against the

Company, whether predicated on this Agreement or otherwise, regardless of who was at fault and regardless of any claims that either Producer or the Company may have against the other, shall not constitute a defense to the enforcement by the Company of any of the covenants in Section 6 of this Agreement.  The Company shall not be barred from enforcing any of the covenants in Section 6 of this Agreement by reason of any breach of (i) any other part of this Agreement or (ii) any other agreement with Producer.

7. **TERMINATION**

   7.1. ***Termination by the Company***.  The Company may terminate Producer's employment hereunder by giving written notice to Producer.  The termination of employment shall be effective on the date specified in such notice.

   7.2. ***Termination by Producer***.  Producer may terminate Producer's employment hereunder by giving at least sixty (60) days written notice to the Company.  The termination of employment shall be effective on the date specified in such notice; provided, however, at any time following receipt of such notice, the Company may:  (a) accept Producer's termination of employment hereunder effective on such earlier date specified by the Company; and/or (b) require Producer to cease performing any services hereunder until the termination of employment.

   7.3. ***Payments Upon Termination***.  If Producer's employment hereunder is terminated pursuant to Section 7, the Company shall:  (a) reimburse Producer for any expenses properly incurred through the date of termination pursuant to Section 4; (b) pay Producer any earned but unpaid Base Salary through the date of termination pursuant to Section 3.1; and (c) pay Producer any earned and payable commissions through the date of termination (in excess of Producer's Draw and any other applicable offsets) pursuant to Section 3.7.

   7.4. ***Miscellaneous Termination Provisions***.  Upon termination of Producer's employment hereunder, Producer hereby irrevocably promises to:

   (a) Immediately return to the Company any and all property of any of the USI Companies in Producer's possession or control, including electronic devices and equipment, corporate credit cards, and building keys.

   (b) Immediately destroy or return to the Company, as directed by the Company, any and all documents, data or other materials (and all copies thereof) in Producer's possession or control, whether in written, digital or other form, which contain or refer to any Confidential Information.

   (c) Not access any of the USI Companies' internal or restricted premises, records, files, databases, networks, websites, emails, voicemails, or other communications.

    (d)    For two (2) years after Producer is no longer employed hereunder, for any reason, provide each new employer with a copy of Section 6 of this Agreement prior to taking any position with such new employer.

    (e)    Subject to obligations under applicable laws and regulations, not publicly make any statements or comments that disparage the reputation of any of the USI Companies or their senior officers or directors.

8.    **REMEDIES**.  Producer acknowledges:  (a) the services to be rendered by Producer are of a special, unique, and extraordinary character; (b) it would be extremely difficult or impracticable to replace such services; (c) the material provisions of this Agreement are of crucial importance to the Company; and (d) any damage caused by Producer's breach of Section 6 of this Agreement would result in irreparable harm to the business of the Company for which money damages alone would not be adequate compensation.  Accordingly, Producer agrees, if Producer violates Section 6 of this Agreement, the Company shall, in addition to any other rights or remedies of the Company available at law, be entitled to equitable relief in any court of competent jurisdiction, including, without limitation, temporary injunction and permanent injunction.  Producer agrees to waive any requirement for the Company to post a bond.

9.    **PRODUCER'S REPRESENTATIONS AND WARRANTIES**

    9.1.    ***Disclosure of Agreements; No Conflict***.  Producer represents and warrants that Producer has supplied to the Company all agreements between Producer and any Person that employed or otherwise retained Producer within the past five (5) years.  Producer further represents and warrants that Producer's execution of this Agreement and performance of the duties contemplated hereunder do not conflict with, and are not impaired by, any law, rule, regulation, or court order by which Producer is bound.

    9.2.    ***No Confidential Information***.  Producer represents and warrants that Producer has not taken any confidential information from any Person that employed or otherwise retained Producer, that Producer has no such confidential information in Producer's possession or control, and that Producer will not use any such confidential information in the performance of Producer's duties hereunder.

    9.3.    ***No Copyright Materials***.  Producer represents and warrants that Producer has not taken any copyrighted materials from any Person that employed or otherwise retained Producer, that Producer has no such copyrighted materials in Producer's possession or control, and that Producer will not use any such copyrighted materials in the performance of Producer's duties hereunder.

    9.4.    ***No Restrictive Purchase Agreements***.  Producer represents and warrants that Producer is not and has not been subject to any agreement (e.g. asset purchase agreement, stock purchase agreement), within the past ten (10) years, whether heretofore expired or not,

which prevents or restricts Producer from competing with any Person and/or soliciting any clients, customers, business or employees (including, without limitation, for the purposes of hiring such employees).

9.5. ***Clients of Former Employers or Entities***. Producer represents and warrants that, during any period of time in which Producer was subject to any restrictions prohibiting Producer from competing with, or soliciting the clients, customers or business of such other organization, individual or business entity, Producer has not made any contact with any clients of any Person that employed or otherwise retained Producer, within the past five (5) years, concerning Producer's business relationship with the Company or concerning a prospective business relationship with such client in violation of such restrictive covenant. Producer further represents and warrants that Producer will not, without prior express direction of the Regional CEO, solicit any clients of any Person that employed or otherwise retained Producer, within the past five (5) years in violation of such restrictive covenant.

9.6. ***Employees of Former Employers or Entities***. Producer represents and warrants that Producer has not made and will not make, without prior express direction of the Regional CEO, any contact with any employees of any Person that employed or otherwise retained Producer, within the past five (5) years, concerning a prospective employment relationship with the Company.

10. **ENTIRE AGREEMENT**. No agreements or representations, oral or otherwise, express or implied, have been made with respect to Producer's employment hereunder except as set forth in this Agreement and the Company's offer letter with Exhibit A attached thereto. This Agreement supersedes and cancels any prior agreement between the Parties regarding Producer's employment with the Company or any USI Company.

11. **AMENDMENT**. Except as set forth in Sections 3.8, 6.9, 13, and other provisions herein as to which the Company expressly reserved the right to modify, no amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by the Party against whom enforcement thereof is sought.

12. **GOVERNING LAW**. This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to principles of conflicts of law.

13. **SEVERABILITY**. The provisions of this Agreement are intended to be interpreted in a manner which makes them valid, legal, and enforceable. In the event any provision of this Agreement is found to be partially or wholly invalid, illegal or unenforceable, such provision shall be modified or restricted to the extent and in the manner necessary to render it valid, legal, and enforceable. If such provision cannot under any circumstances be so modified or restricted, it shall be excised from this Agreement without affecting the validity, legality or enforceability of any of the remaining provisions.

14. **WAIVERS**.  No waiver of any default or breach of this Agreement shall be deemed a continuing waiver or a waiver of any other breach or default.  Failure to enforce any provision of this Agreement shall not be deemed a waiver of that provision or any other provision of this Agreement.

15. **ASSIGNMENT**.  Producer may not assign any rights (other than the right to receive income hereunder) under this Agreement without the prior written consent of the Company.  Producer's obligations under this Agreement inure to the Company, its successors and assigns.  The Company may, at any time and without Producer's further approval or consent, assign or transfer this Agreement, by merger, asset sale or otherwise, to any subsidiary, affiliate, purchaser, acquirer or other assignee or successor.  Any such successor or assign is expressly authorized to enforce the terms of this Agreement.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed as of the dates set forth below.

| **USI Insurance Services LLC** | **Producer** |
|---|---|
| By: _James Dunn_ (DocuSigned) | By: _signature_ (DocuSigned) |
| James W. Dunn | Christopher Kane |
| Regional Chief Executive Officer | |
| Date: 7/30/2018 | Date: 7/19/2018 |